IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **MICHAEL NOTTKE** | ) | Case No.:  3:17-cv-544 |
| 5286 SR 113 | ) | |
| Bellevue, OH  44811 | ) | JUDGE |
| | ) | |
| and | ) | **COMPLAINT WITH JURY DEMAND** |
| | ) | |
| **NORMAN JACOBS** | ) | |
| 11114 Billings Road | ) | |
| Bellevue, OH  44811 | ) | |
| | ) | |
| On behalf of themselves and those | ) | |
| similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **NORFOLK SOUTHERN RAILWAY** | ) | |
| **COMPANY** | ) | |
| Three Commercial Place | ) | |
| Norfolk, VA 23510 | ) | |
| | ) | |
| also serve: | ) | |
| c/o CSC – Lawyers Incorporating | ) | |
| Service | ) | |
| 50 W. Broad St. Suite 1800 | ) | |
| Columbus, OH 43215 | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

1.      This is an action seeking redress for one of the most macabre forms of

environmental contamination, in the form of noise pollution, created by one of the

nation's largest railroad companies.  In 2015, after a $160,000,000 expansion of the

Bellevue railroad yard, its owner, Norfolk Southern, added multiple retarders which have dramatically and unforgivably increased the amount of noise experienced by the yard's neighbors.  This has resulted in a nuisance, which has in turn decreased in property values (actually assessed as such by the auditor on the Huron County side of the yard (the yard straddles Erie and Huron Counties), as well as in stress, adverse health impacts, and loss of the enjoyment of life.  None of this is necessary because Norfolk Southern has available to it sound dampening options at a fraction of the cost of its investment.

## **PARTIES**

2.     Plaintiff, Michael Nottke, at all times relevant hereto has owned real property at 5286 SR 113, Bellevue, Ohio in Huron County, Ohio.  Mr. Nottke has owned this property since 1974 and today, owns it with his wife.

3.     Plaintiff, Norman Jacobs, at all times relevant hereto has owned real property at 11114 Billings Road, Bellevue, Ohio in Erie County, Ohio.  Mr. Jacobs, along with his wife, has owned this property since 2006.

4.     Defendant Norfolk Southern Railway Company ("Norfolk Southern") operates a Class 1 railroad in interstate commerce in the United States.  Norfolk Southern is a Virginia corporation licensed to conduct business within the State of Ohio.  Norfolk Southern is a wholly-owned subsidiary of the Norfolk Southern Corporation, which is also a Virginia corporation.   The corporate headquarters is located at Three Commercial Place, Norfolk, VA 23510.   Both Norfolk Southern and its parent corporation are citizens of the Commonwealth of Virginia.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(1), because the amount in controversy exceeds $75,000, and the parties are citizens of different States.

6.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2), because a substantial part of the events and omissions giving rise to this claim occurred within the territory of this District, and because all of the property that is the subject of this action is situated within the territory of this District.

## FACTS

7.     Norfolk Southern is owned by Norfolk Southern Corporation, a publicly traded corporation with approximately $11,000,000,000 in revenues, with net income also measured in the billions of dollars.  Norfolk Southern operates 24,000 miles of track in 22 states.

8.     Norfolk Southern operates a large railyard located in Bellevue, Ohio.  That yard was originally constructed in 1966 by Norfolk Southern's predecessor in interest, the Norfolk and Western Railway.  The Bellevue Yard, now named the Moorman Yard after Norfolk Southern's immediate past CEO, is the largest of the railroad's 12 major classification yards, where trains are broken up and reformed.  According to Norfolk Southern, the $160,000,000 expansion doubled the yard's daily sorting capacity from 1,800 freight cars to 3,600, boosting the number of trains which originate, terminate or pass through Bellevue to approximately 110 trains per day.

9.     In 2015, at the culmination of the Bellevue Yard's expansion, Norfolk Southern installed new retarders at the top of what is called a hump.  A yard with a

hump operates by pushing trains up and over a hump, after which the individual cars are redirected to different tracks to make up new trains.  The cars are slowed on the back end of the hump by a retarder, essentially a giant braking system.  The retarders installed in 2015 dramatically increased the amount of noise emanating from the Bellevue Yard.

10.    When in operation, the retarders generate a very loud, unbearable high-pitched squealing sound of metal brake shoes rubbing on the steel wheels of the train cars.  The noise, also generally described as screeching, is generated every time a car passes through a retarder and the retarder activates.  These events happen hundreds and thousands of times a day at the Bellevue Yard.

11.    The squeals can be heard from neighboring properties, including those owned by the Named Plaintiffs, 24 hours a day, nearly every day of the year.

12.    In fact, acoustical testing has demonstrated that the squeals are often loudest, most sustained, and most pronounced in the very early morning hours, just after midnight.

13.    Squeals as loud as 100 dB are routinely observed on neighboring residential properties.

14.    Norfolk Southern pays only lip service to the notion, as stated in its most recent annual report, that "[t]he most important obligation we have to the communities in which we operate is to operate safely."  "We are partners with our customers and communities in fostering local development."   "It is our corporate responsibility to minimize the environmental impacts of our operations on the communities we serve, and in 2015 we maintained and built upon Norfolk Southern's continuing leadership in

corporate environmental stewardship."  Although that report was issued in March of 2016, shortly thereafter, Norfolk Southern announced a plan to cut expenses by more than $650 million per year.

15.    Since the new retarders were installed at the Bellevue Yard, impacted residents have pleaded with railroad officials as well as public office holders to do something about the unbearable noise.  In response, Norfolk Southern again merely paid lip service to the notion of community service.  By letter dated June 23, 2016, Norfolk Southern official Darrell Wilson stated in response to United States Senator Sherrod Brown, who has pressed these concerns, that "[a]s a service-oriented company, we are highly invested in the communities in which we operate, and are committed to working to serve our customers in minimizing any negative impacts that can occur for our neighbors."  Mr. Wilson continued by stating that "[o]ur Ohio team has been made aware of the concerns about the noise emanating from the master and group retarders at the yard.  We have met with local stakeholders, residents and state officials.  In response, we have convened an internal working group to study this issue. They are working to determine if a feasible engineering solution can be found to try to address the concerns of the residents in Lyme Township.  Norfolk Southern certainly agrees that we should work to find ways to balance between the needs of our global and domestic economies and the needs of our communities."

16.    The Wilson letter continues by saying "[t]o be fair this is a very complex issue which involves a detailed acoustics analysis.  As our team continues exploring the best method of noise mitigation at Moorman Yard, I appreciate your patience and will make myself available to answer any further questions you or your staff and

constituents may have.  NS is committed to trying to find a way that can mitigate this issue, without compromising the essential mission of Moorman Yard to freight rail operations."

17.     The answer to Mr. Wilson's question, and that of his team, appears to be fairly simple in that noise dampening pads are available for a total cost of approximately $400,000.  In terms of the complexity of the acoustical analysis required, at their own expense, plaintiffs retained an acoustical engineer to analyze conditions at receiving properties, and on the first inspection determined that noise levels exceeded even the bizarrely high noise level established in 1980 by the Federal Railroad Administration (FRA), in concert with the Environmental Protection Agency (EPA).

18.     To place the issue in some context, the FRA, as Norfolk Southern has acknowledged in correspondence pertaining to the Moorman Yard, permits a maximum sound level of 83 decibels when measured over 30 consecutive cars running through the retarder.

19.     The regulation of noise emissions by the FRA and EPA has its genesis in the Noise Control Act of 1972.  Section 17 of this act of Congress mandated the Administrator of the EPA, in consultation with the Secretary of Transportation, to develop and publish standards governing noise emissions from the operations of "surface carriers in interstate commerce", i.e., railroads.  49 U.S.C. § 4916.  The statute further provided that, after the effective date of a regulation under the Act, no State of political subdivision thereof could adopt or enforce any regulation or standard more stringent than the one established by the federal government.  *Id.* at (c)(1).

20.     The EPA began to consider the issue of national noise limits on railroad operations in 1972.  By 1974, it had concluded that no national noise limits on such fixed operations as retarders was best left to local standards and it was not necessary or advisable to adopt national standards.

21.     But the railroad industry sued to require the EPA to promulgate nationwide noise emission standards pursuant to Section 17 of the Noise Control Act.   *Assoc. of Am. Railroads v. Costle*, 562 F.2d 1310 (D.C.Cir. 1977). The U.S. Circuit Court for the D.C. Circuit ruled in favor of the railroads, requiring the EPA to "promulgate noise emission standards." *Id.* at 1311.

22.     The EPA did draft standards by 1979, but warned that a national standard would not result in site-specific solutions and that many people would still be significantly and adversely impacted by railroad noise once the limits – originally proposed in 1979 – were placed into effect.

23.     However, the railroads again had their way and the much more protective standards proposed in 1979 were hugely watered-down by the time the regulations went into effect in 1984.  For example, the EPA had proposed the following limits for retarders:

| 24 hour test | 70 dB by January 1, 1982 | |
| --- | --- | --- |
| | 65 dB by January 1, 1984 | |
| One hour test | daytime | night time |
| | 84 dB | 74 dB by January 1, 1982 |
| | 74 dB | 69 dB by January 1, 1984 |

The EPA also noted that retarders cause "a highly audible and annoying screech" and that even with the much tougher regulations being proposed at that time, the character of the noises are such that "they represent a major problem in terms of annoyance". The EPA also noted that an outdoor noise limit of 55 dB is what the agency had determined was a level that was "protective of public health and welfare with an adequate margin of safety".  The day/night differentiation, the 24 hour test and the one hour test would all later be abandoned such that the plaintiffs and their neighbors are regularly subjected to nighttime noise levels more than eight times was the EPA originally determined protected public health and safety.

24.     The EPA's noise standards were also based upon the best available technology at the time.  More than 30 years have since passed, during which a host of new materials and sound-dampening options have been developed.

25.     After extensive public comment, including vehement criticism from the American Association of Railroads (AAR), and individual railroads themselves, the EPA substantially revised its proposed noise emissions standards, weakening them significantly.

26.     Revised standards were published in Volume 45 of the Federal Register on January 4, 1980 (45 FR 1263).  This set of rules included a maximum operating standard for retarders, as required by the *AAR v. Costle* decision.  This regulation prohibited any carrier from operating a retarder that exceeded maximum received sound levels of 83 dB, when measured from a residential or commercial property.

27.     The EPA regulation at issue, 40 CFR 240.14, was made effective January 15, 1984.  As noted, it was adopted at the behest of the railroad industry which sued the

8

EPA to force it to adopt a uniform national standard so that the industry would not be subjected to local ordinances. The resulting regulation can only be described as pure industry capture. No reasonable human being who has not yet sustained severe hearing damage could live in a residence subjected to anything close to 83 decibels.

28. This 83 dB maximum operating standard is also incorporated by reference into the compliance and enforcement standards for the FRA. *See* 49 CFR 210.1; 210.33.

29. In adopting the 83 dB operating standard for retarders, the EPA anticipated that railroads could easily achieve the necessary sound abatement to comply with this standard by simply erecting barriers along either the retarder tracks themselves, or along the edge of the hump yard's property line. The EPA Administrator believed this to be the best compromise available: "These regulations reflect the degree of noise reduction achievable through the application of best available technology on a national basis taking into account the cost of compliance and the time available for compliance." 45 FR 1253.

30. Almost nine months after responding to Senator Brown, Norfolk Southern has done nothing to dampen the noise. Noise levels promulgated by occupational safety organizations limit exposure to a noise of 85 decibels to 40 hours per week – while wearing devices to protect against hearing loss. Environmental noise regulations specify maximum outdoor noise levels of 60-65 decibels. Recommended noise levels for residences are equal to or less than 45 decibels. In contrast, residents surrounding the Moorman Yard are regularly and repeatedly exposed to sound events exceeding 90 and 100 decibels, the equivalent of a jet flying directly overhead. Residents are unable

to hold conversations, open windows or hear their televisions.  To make matters worse, sound levels generally increase at night.  Outside of the regulation maximum of 83 decibels (as a result of industry capture), the EPA actually requires that night time permissible noise be reduced by 10 decibels (each increase of 10 decibels is equivalent to a doubling of the sound of the noise).

31.     Hump yards, and the retarders necessary to slow the cars on the backside of the hill, have significantly decreased in number across the United States.  The reason is simple:  the yards create unbearable noise for neighbors, which health experts increasingly understand are detrimental to the short and long term health in the community.  Norfolk Southern's decision to expand the Bellevue Yard and install two retarders which create extreme noise events near local property owners speaks volumes about Norfolk Southern's regard for the Bellevue community.

32.     Indeed, the burden of tolerating the extreme noise generated from railroad classification yards with operating retarders often falls on rural communities like Bellevue, Ohio, as the AAR pointed out in its 1980 comments on the then-proposed retarder operating standards:

> In actual practice the railroads often plan railroad development away from
> noise sensitive areas, e.g., the construction of new yards in rural areas.

Comments of the Am. Assoc. of Railroads, EPA Docket No. ONAC 80-01, p. 12, April 4, 1980.

33.     Despite neighbor complaints, the efforts of two U.S. Senators and a Congressman, meetings, site tours, analyses, and rounds of letter-writing, Norfolk Southern has declined to so much as erect a barrier wall around the offending retarders,

or along its property line, the 1980s technology that the EPA *expected* railroads would utilize to comply with Noise Control Act requirements.

34.     Instead, thanks to Norfolk Southern's negligent deviation from federally-imposed standards of care, Named Plaintiffs and their neighbors have been subjected to extreme noise exposures for months on end, resulting in physical, emotional, and psychological harms, as well as substantial damage to the value of their real property, affecting not only landowners but also local governments and schools which rely on taxes levied on those properties.

## Class Action Allegations

35.     Plaintiffs repeat and incorporate herein all previously pleaded averments.

36.     Plaintiffs bring this class action pursuant to Fed.R.Civ.P. 23, on behalf of themselves and all others similarly situated, with the members of the class being defined as follows:

> All individuals, natural or otherwise, who have owned or occupied, since January 1, 2015, real property, any portion of which lies within 7000 feet of active retarders operating at the Norfolk Southern Railway Company's Moorman Yard, Bellevue, Ohio, as defined by a centerpoint with coordinates 41.292423, -82.788702 decimal degrees, and who have suffered economic and/or non-economic harm as a result of noise generated by those retarders.

> The Defendant, its subsidiaries, its affiliate companies, and its officers are specifically excluded from the Class.

37.     The members of the class are so numerous that joinder would be impracticable.  From public records plaintiffs can determine that there are over 200 property owners, and many more residents since a majority of the properties are residential.

38.     The class is readily identifiable through the records of the Erie and Huron County Auditors.

39.     The claims of Plaintiffs and the members of the class raise common questions of law and fact that predominate over any questions affecting only individual class members, including:

   a. Whether Defendant created an actionable nuisance by exceeding permissible noise limits.

   b. Whether Plaintiffs and the members of the class they seek to represent have sustained property damages as a direct and proximate cause of Defendant's conduct.

   c. Whether Plaintiffs and the members of the class they seek to represent have sustained damages in the form of stress and lost enjoyment of life as a direct and proximate cause of Defendant's conduct.

40.     Defendant's conduct in relation to each of the class members was virtually identical.

41.     The claims of the Plaintiffs are typical of the claims of members of the class.

42.     The representative parties will fairly and adequately represent the interests of the members of the class.

43.     Both Plaintiffs and their counsel meet the adequacy requirement.

44.     The Plaintiffs are not antagonistic to the other members of the class and are, in fact, similarly situated with respect to Defendant.  The interests of the Plaintiffs in this matter are identical to those of the members of the class.

45.     The Plaintiffs' legal counsel has a reputation for competency, experience and skill in handling complex litigation, including class actions.  The Plaintiffs' counsel has and will continue to dedicate high levels of skill and dedication to the vigorous prosecution of this class action litigation.

46.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

47.     The expense and burden of individual litigation are impediments to individual class members seeking redress for the wrongful conduct alleged.

48.     This action is maintainable under Fed.R.Civ.P. 23(b)(3) because questions of law or fact predominates over any question affecting only individual members and that a class action is superior method to other mechanisms available.

49.     This action involves almost exclusively identical issues among members of the class.

50.     The questions of law and fact arise out of the standard conduct of Defendant.  Individual issues that may arise are limited to those with respect to damages, which may be calculated by use of a mathematical formula.

51.     A class action is the superior method to the alternatives such as: joinder; a test case; and individual actions.  The number of class members makes joinder impracticable.  Litigation is too costly for individuals to each bring an individual claim due to the relatively small claim per member of the class and expense of litigating against a defendant with virtually limitless litigation resources.  The test case is not a superior method because Defendant would likely settle individual claims to prevent

13

adjudication of liability and a test case scenario would likely require follow-up litigation, which could be avoided by a class action.

52.     Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude the maintenance of a class action.  Furthermore, by way of class action, the Court can determine the rights of all members of the class with judicial economy.

## COUNT I:  NUISANCE

53.     The Plaintiffs hereby incorporate all previously plead allegations.

54.     Defendant owns and operates the Bellevue Yard.

55.     The Bellevue Yard emits noises that exceed the federal standard of care imposed by the Secretary of Transportation through the FRA and by the Administrator of the EPA and which makes living in the area unbearable and is so severe that it has caused a decrease in local property values.

56.     The noises emitted by Defendant from its retarder operations in the Bellevue Yard have been measured on the Plaintiffs' receiving properties at adjusted maximum weighted sound levels in excess of 83 dB.

57.     Defendant is deviating from the *de minimus* federal standard of care imposed by 40 CFR 201.14 and 49 CFR 210.33 in its operation of retarders at the Bellevue Yard.   To be clear, Plaintiffs are seeking damages for the nuisance that Defendants has and continues to create and seek damages for the nuisance as determined by a jury.  Plaintiffs do not limit their claim to noises exceeding 83 dB.

58.     As a direct and proximate result of the foregoing conduct of the Defendant, Plaintiffs suffered damages to their persons and property as alleged herein.

59.     Plaintiffs' damages are economic and non-economic in nature and include diminution of property value, as well as physical and emotional harms to all persons residing on the properties.

60.     Plaintiffs did not consent for Defendants' noise pollution to invade their land and property.

61.     Defendant maliciously, recklessly, willfully, and wantonly and with a conscious disregard for the rights Plaintiffs created a nuisance on the Plaintiffs' property through the invasion of noise controlled by Defendant on Plaintiffs' land and property which substantially and unreasonably interfered with Plaintiffs' use and enjoyment of their property.

62.     Defendant's substantial and unreasonable interference with Plaintiffs' use and enjoyment of their property constitutes a nuisance for which the Defendant is liable to Plaintiffs for all damages arising from such nuisance, including compensatory and punitive relief.

WHEREFORE, Named Plaintiffs pray for an order certifying the proposed class, an order appointing undersigned counsel as class counsel, for judgment in their favor and in favor of the class, for an award of damages in an amount exceeding $25,000 for compensatory damages, punitive damages, attorney fees, costs, and any and all additional relief that the Court deems just and equitable.

Respectfully submitted,

*s/ Dennis E. Murray, Jr.*
Dennis E. Murray, Jr. (0038509)
Charles M. Murray (0052083)
Joseph A. Galea (0089550)
MURRAY & MURRAY CO., L.P.A.
111 East Shoreline Drive

Sandusky, Ohio  44870-2517
Telephone:  (419) 624-3126
Facsimile: (419) 624-0707
dmj@murrayandmurray.com
cmm@murrayandmurray.com
jag@murrayandmurray.com

Attorneys for Plaintiffs

## **Jury Demand**

Plaintiffs hereby demand a trial by jury as to all causes of action and issues so triable.

*s/ Dennis E. Murray, Jr.*
Dennis E. Murray, Jr.  (0038509)
MURRAY & MURRAY CO., L.P.A.

Attorney for Plaintiffs