# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# WESTERN DIVISION

Michael Nottke, et al.,                                 Case No. 3:17CV544

        Plaintiffs

        v.                                             **ORDER**

Norfolk Southern Railway Co.,

        Defendant

This private-nuisance case arises from defendant Norfolk Southern Railway Company's operations at its Bellevue, Ohio, rail yard.

Plaintiffs Michael Nottke and Norman Jacobs own real property adjacent to the rail yard. They allege that Norfolk Southern's operations there create "extreme noise pollution" in the form of continuous high-pitched squeals. According to plaintiffs, the noise pollution has diminished the value of their property and caused them physical and emotional damage. They bring this suit under Ohio law for qualified and absolute nuisance.

Jurisdiction is proper under 28 U.S.C. § 1332(a)(1). (Doc. 11 at ¶¶2–4).

Pending is Norfolk Southern's motion under Fed. R. Civ. P. 12(b)(6) to dismiss the absolute-nuisance claim and part of the qualified-nuisance claim. (Doc. 14). For the following reasons, I grant the motion in part and deny it in part.

**Background**

Norfolk Southern operates a classification yard in Bellevue where "trains are broken up and formed into new ones." (Doc. 16 at 7). To facilitate that process, Norfolk Southern employs a "hump classification system" in which an engine pushes train cars over a hump, the cars roll down the opposite side of the hump, and the cars form new trains. (*Id.*; Doc. 11 at ¶¶8–9).

As the cars roll down the hump, large braking systems called retarders decelerate the cars.

These retarders, the plaintiffs allege, produce "a very loud, unbearable high-pitched squealing sound" when their metal brake shoes rub against the train cars' steel wheels. (Doc. 11 at ¶10). Plaintiffs can hear these sounds "every time a car passes through a retarder and the retarder activates," which "happen[s] hundreds and thousands of times a day at the Bellevue Yard." (*Id.*)

According to the plaintiffs' acoustical testing, "[s]queals as loud as 100 [decibels] are routinely observed on neighboring residential properties." (*Id.* at ¶¶13, 17).

That noise level exceeds a federal regulation that says "no carrier subject to this regulation shall operate retarders that exceed an adjusted average maximum A-weighted sound level of 83 dB at any receiving property measurement location[.]" 40 C.F.R. § 201.14.

After Norfolk Southern started using the retarders, in 2015, neighboring landowners and at least one of Ohio's United States Senators pressed the company to abate the noise pollution. (Doc. 11 at ¶15). One option that these stakeholders proposed was the installation of noise-dampening pads, which were available for about $400,000. (*Id.* at ¶17). Norfolk Southern declined to take that or any other measure to reduce the noise emanating from the retarders. (*Id.* at ¶¶17, 30, 33, 35).

In March, 2017, plaintiffs brought this suit on behalf of themselves and a proposed class of all individuals who have, since January 1, 2015, owned or occupied real property within 7,000 feet of the Bellevue Yard.

In Count I, they allege that Norfolk Southern created a qualified nuisance by operating retarders "that exceed the [83-decibel] federal standard of care." (*Id.* at ¶¶58–60). Plaintiffs allege that the retarders' emission of noises at or below the 83–decibel ceiling also constitutes a qualified nuisance. (*Id.* at ¶60). In Count II, plaintiffs allege that the railroad created an absolute nuisance by "intentionally and unreasonably subject[ing] Plaintiffs and their neighbors to extreme noise exposures" by operating the retarders. (*Id.* at ¶69).

**Standard of Review**

A complaint must contain a "short and plain statement of the claim showing the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

To survive a motion to dismiss under Rule 12(b)(6), the complaint "must contain sufficient factual matter, accepted as true, to state a claim that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

**Discussion**

**A. Absolute Nuisance**

Norfolk Southern argues that plaintiffs have not pleaded a plausible absolute-nuisance claim for two reasons.

The railroad first argues that "[t]he foundational element for an absolute nuisance claim is that 'no matter how [careful one is], such activities are inherently injurious and cannot be conducted without damaging [someone else's property or rights].'" (Doc. 14 at 7) (quoting *Brown v. Scioto Cnty. Bd. of Comm'rs*, 87 Ohio App. 3d 704, 713 (1993). Because the plaintiffs have alleged that it is possible for Norfolk Southern to abate the noise pollution (by means of the noise-dampening pads), the railroad asserts that its operations at the Bellevue Yard cannot be an absolute nuisance. (Doc. 14 at 7).

Second, Norfolk Southern maintains that an absolute-nuisance claim requires "some affirmative act on the part of a defendant." *Kaczor v. City of Bellaire*, 1998 WL 404189, *6 (Ohio App.). But here, the railroad contends, the plaintiffs have alleged only an omission – that is, failing to install noise-dampening pads or otherwise remediate the noise pollution. (Doc. 14 at 8–9).

**1. Legal Framework**

Ohio law divides private-nuisance claims into two categories – absolute nuisances and qualified nuisances – and "[t]he distinction between absolute and qualified nuisance depends on the conduct of the defendant." *Scott v. Nameth*, 2015-Ohio-1104, ¶12 (Ohio App.).

"An absolute nuisance, or nuisance per se, is based on intentional conduct or an abnormally dangerous condition that cannot be maintained without injury to property, no matter what precautions are taken." *Szuch v. FirstEnergy Nuclear Operating Co.*, 2016-Ohio-620, ¶50 (Ohio App.). "A qualified nuisance, on the other hand, is a lawful act so negligently or carelessly done as to create a potential and unreasonable risk of harm, which in due course results in injury to another." *Id.*

As the Court of Appeals explained in *Gevelaar v. Millenium Inorganic Chems.*, 2013-Ohio-435, ¶18 (Ohio App.), an absolute nuisance "consists of [1.] an intentional act resulting in harm; [2.] an act involving . . . unlawful conduct causing unintentional harm; or [3] a non-culpable act resulting in accidental harm, for which, because of the hazards involved, absolute liability attaches notwithstanding the absence of fault." (Internal brackets in original); *see also Paulus v. Citicorp. N. Am., Inc.*, 2013 WL 5487053, *4 (S.D. Ohio) ("Ohio law allows plaintiffs to base an absolute nuisance claim on 'intentional conduct'") (quoting *State ex rel. R.T.G. v. State*, 98 Ohio St. 3d 1, 13 (2002)).

### 2. Plaintiffs Have Alleged a Plausible Claim Based on the Intentional Operation of the Retarders

As the foregoing case law makes clear, Norfolk Southern's first argument has no merit.

One way of pleading an absolute-nuisance claim is to allege that, no matter the precautions that the defendant might take, the defendant's activities are so hazardous or dangerous that it is impossible to conduct them without damaging another's property rights. *Brown*, *supra*, 87 Ohio App. 3d at 713.

But that is merely one way, rather than the only way, of pleading an absolute-nuisance claim.

Here, the plaintiffs contend that Norfolk Southern created an absolute nuisance by intentionally operating retarders that generate high-pitched squeals that interfere with their use of their property and inflict physical and emotional harm. (Doc. 11 at ¶¶66–71). This type of "intentional" absolute-nuisance claim has a strong foundation in Ohio law.

"[A]n absolute nuisance requires intentional conduct[.]" *Angerman v. Burick*, 2003-Ohio-1469, ¶10 (Ohio App.). "Intentional, in this context, means not that a wrong or the existence of a

5

nuisance was intended but that the creator of it intended to bring about the conditions which are in fact found to be a nuisance." *Id.*

Following that rule, the Ohio courts have recognized absolute nuisances where a defendant has "intentionally built and operated [a] motorcross track, which created a great deal of noise," *Angerman*, *supra*, 2003-Ohio-1469, at ¶11; where a defendant's "activity of manufacturing and the manner in which that process is conducted generates a humming noise and loud steam blasts," *Gevelaar*, *supra*, 2013-Ohio-435, at ¶24; and where a defendant "intentionally carried out [a] construction project adjacent to the [plaintiffs'] property" that resulted in "an increase in the noise level" on the property, *Amore v. Ohio Turnpike Comm'n*, 194 Ohio App. 3d 182, 189 (2011).

Likewise, in the *Paulus* case, *supra*, 2013 WL 5487053, at *4, Judge Sargus held that the plaintiffs stated a plausible absolute-nuisance claim by alleging that the defendant "proceeded intentionally with its generator testing schedule, with the knowledge that it has harmed the Pauluses' quality of life, enjoyment of their land, sleep patterns, and work performance."

That was the correct result, Judge Sargus explained, because "Ohio law allows plaintiffs to base an absolute nuisance claim on intentional conduct." *Id.* (internal quotation marks omitted).

Norfolk Southern says I ought to write off cases like *Angerman* and *Amore* as aberrations in Ohio law owing to the Ninth District Court of Appeals' supposed "outlier" approach to absolute-nuisance claims, but that contention is unpersuasive for two reasons.

It is not just the Ninth District that holds that a defendant's intentional conduct supports an absolute-nuisance claim. The Eleventh District, finding, as I do, cases like *Angerman* and *Amore* to be persuasive, followed its approach in *Gevelaar*, *supra*, 2013-Ohio-435, at ¶¶20–24. Judge Sargus

6

also recognized, in *Paulus*, that intentional conduct that necessarily interferes with another's enjoyment of his or her property rights supports an absolute-nuisance claim.

Furthermore, the court in *Angerman*, 2003-Ohio-1469, at ¶¶12–13, persuasively explained why it is that intentional conduct, standing alone, supports an absolute-nuisance claim:

> Early Supreme Court cases explained the distinction between absolute and qualified nuisance in basic terms, convincing this court that this situation involves an absolute nuisance rather than a qualified one. A qualified nuisance requires proof of negligence because, otherwise, there is no nuisance. *Taylor v. Cincinnati* (1944), 143 Ohio St. 426, 55 N.E.2d 724, upon which the trial court and both parties rely, quoted extensively from Judge Cardozo in the leading case of *McFarlane v. City of Niagara Falls*, 247 N.Y. 340, 160 N.E. 391, to set forth several situations in which a qualified nuisance arises. Most examples involved negligent maintenance of roads, buildings, trees, electrical wires, boilers, oil tanks, etc. See *Taylor* at 441–444, 55 N.E.2d 724. Properly maintained, these roads, buildings, trees, electrical wires, and oil tanks did not constitute nuisances for they did not cause injury to anyone. *See id.* Consequently, to establish a nuisance in these situations, a plaintiff must prove negligence by those who have a duty to maintain the areas.
>
> Absolute nuisance, on the other hand, does not require proof of negligence. Where the harm and resulting damage are the necessary consequences of just what the defendant is doing, or is incident to the activity itself or the manner in which it is conducted, the law of negligence has no application and the rule of absolute liability applies. *Id.* at 432, 55 N.E.2d 724. The primary meaning [of nuisance] does not involve the element of negligence as one of its essential factors. * * * One who emits noxious fumes or gases day by day in the running of his factory may be liable to his neighbor though he has taken all available precautions. *Id.* at 441–442, 55 N.E.2d 724, quoting McFarlane, *supra*.

Here, plaintiffs have stated a facially plausible claim for absolute nuisance by alleging that the harms they experience – diminished property values, physical harm, and emotional injuries – are the necessary consequence of Norfolk Southern's intentional operation of the retarder system. Accordingly, I reject defendant's first argument for dismissal.

### 3. Plaintiffs Have Alleged an Affirmative Act

For similar reasons, I reject Norfolk Southern's argument that plaintiffs have not alleged an affirmative act, as Ohio law requires. *See Kaczor*, 1998 WL 404189, at *6. Plaintiffs contend that it is Norfolk Southern's intentional operation of the retarders that caused the nuisance (Doc. 11 at ¶¶67, 69–70), and such an allegation satisfies the intentional-act requirement.

### B. Preemption

Norfolk Southern next argues that I should dismiss that portion of the qualified-nuisance claim based on the retarders' emission of noises at or below 83 dB.

The railroad contends that federal law – specifically, 40 C.F.R. § 201.14 – permits it to operate retarders as long as noise levels do not exceed "an adjusted average maximum A–weighted sound level of 83 dB[.]" (Doc. 14 at 9). Norfolk Southern further observes that the Noise Control Act, 42 U.S.C. § 4916(c)(1), prohibits the enforcement of "any standard applicable to noise emissions resulting from the operation of the same equipment or facility of such carrier unless such is identical to a standard applicable to noise emissions resulting from such operations prescribed by any regulation under this section."

Taken together, the railroad argues, these provisions preempt plaintiffs' claim that Norfolk Southern's emission of noise levels at or below 83 decibels creates a qualified nuisance.

Plaintiffs do not dispute the preemptive effect of these provisions of federal law. (Doc. 16 at 14–15). Rather, they assert that applying the Noise Control Act's preemption rule to their nuisance claim "amounts to an unconstitutional taking of private property for *private* use, in violation of the Public Use Clause of the Fifth Amendment." (*Id.* at 14) (emphasis supplied). According to plaintiffs,

the 83–decibel ceiling "authorize[s] a permanent physical invasion by the defendant under the meaning of *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982). (*Id.*).

I disagree.

Assuming that the takings claim is properly before me (despite plaintiffs' failure to plead such a claim in their amended complaint), and even assuming that there are no other deficiencies in the putative "permanent physical invasion" takings claim – something about which I am rather doubtful – the claim fails because any such taking was for a public use.

The Fifth Amendment permits the federal government to "transfer property from one private party to another if future 'use by the public' is the purpose of the taking." *Kelo v. City of New London, Conn.*, 545 U.S. 469, 477 (2005). The government may not, however, take "private property for strictly private uses, regardless of whether just compensation is paid." *Montgomery v. Carter Cnty., Tenn.*, 226 F.3d 758, 765 (6th Cir. 2000).

"[A]ll that is required for the taking to be considered for public use is some rational relationship to some 'conceivable public purpose.'" *Id.* (quoting *Hawaii Housing Auth. v. Midkiff*, 467 U.S. 229, 241 (1984). "Very few takings will fail to satisfy that standard. As a result, the examples [of private takings] tend to be highly implausible hypotheticals." *Id.* at 766.

Here, the alleged taking – permitting Norfolk Southern's retarders to generate noise that does not exceed 83 decibels – bears "some rational relationship to some 'conceivable public purpose." *Id.* at 765. The regulation serves a public purpose by facilitating Norfolk Southern's rail operations – as well as the operations of all railroads that deploy retarders. Absent a uniform and nationally applicable decibel ceiling, Norfolk Southern and other railroads would inevitably be subject to a patchwork of conflicting regulations in the many states in which they operate. Eliminating such

conflicting regulations serves the public interest in efficient rail operations and the free flow of commerce across state boundaries.

Plaintiffs respond that the 83–decibel ceiling is so insufficiently protective of adjacent landowners' health and well-being that it amounts to "little more than a giveaway to rail carriers which utilize active retarders." (Doc. 16 at 22). But that is an argument that federal regulators struck the wrong balance between landowner and rail interests, and plaintiffs have not shown that the resulting compromise was so fanciful and one-sided as to lack any conceivable relationship to the public good.

Accordingly, I reject plaintiffs' private-takings argument and hold that federal law preempts that part of their qualified-nuisance claim based on noise levels at or below 83 decibels.

### C. Damages

Finally, Norfolk Southern argues that, because the plaintiffs have alleged a continuing nuisance, they may not recover damages for the loss of value of their fee estates. (Doc. 14 at 10–11).

Beyond the classification of nuisances as either absolute or qualified, Ohio law also recognizes that a nuisance may be continuing or permanent.

A continuing nuisance occurs when the defendant's "tortious activity is ongoing, perpetually creating fresh violations of the plaintiff's property rights. The damage caused by each fresh violation is an additional cause of action." *Weir v. E. Ohio Gas Co.*, 2003-Ohio-1229, ¶18 (2003). A permanent nuisance, in contrast, occurs when the defendant's "tortious act has been fully completed but injury to the plaintiff's estate from that act persists in the absence of further conduct by the defendant." *Id.*

The classification of the nuisance as continuing or permanent defines the measure of damages.

If the nuisance is continuing, then the "proper measure of damages is the 'impairment of the value of the use of the property and not the decrease in the value of the fee.'" *Orsuto v. Franks Transport, Inc.*, 1983 WL 6962, *2 (Ohio App.) (quoting *Frey v. Queen City Paper Co.*, 79 Ohio App. 64 (1946)). If the nuisance is permanent, then plaintiff may recover damages for lost property value.

Construed in the light most favorable to the plaintiff, the complaint alleges a claim for a continuing nuisance.

Plaintiffs allege that Norfolk Southern is engaged in ongoing tortious activity – namely, the continuous and daily operation of the retarders. (Doc. 11 at ¶11) ("The squeals can be heard from neighboring properties, including those owned by the Named Plaintiffs, 24 hours a day, nearly every day of the year."); (*id.* at ¶60) ("Plaintiffs are seeking damages for the nuisance that Defendant[ ] has and continues to create"). Nowhere do plaintiffs allege that Norfolk Southern has ceased those activities giving rise to their nuisance claim.

Plaintiffs respond that their nuisance claim is, essentially, a hybrid claim that comprises elements of a permanent-nuisance claim and a continuing-nuisance claim. (Doc. 16 at 25–27).

Essentially conceding that the tortious activity is ongoing (and thus that the nuisance is continuing), plaintiffs emphasize the supposed "economic permanence" of Norfolk Southern's use of retarders. (*Id.* at 26). Plaintiffs contend that, given the $160 million investment in the Bellevue Yard that brought about the retarders, they have every reason to expect that Norfolk Southern "will not deviate from its course of conduct," such that the nuisance is permanent. (*Id.*).

This argument lacks any basis in Ohio law.

As plaintiffs acknowledge, "'[t]he defendant's ongoing conduct or retention of control is the key to distinguishing" a continuing nuisance from a permanent nuisance. (*Id.* at 25) (quoting *Sexton v. City of Mason*, 117 Ohio St. 3d 275, 282 (2008)). But the object of the nuisance here is not the railroad's financial investment in the Bellevue Yard; it is its operation of noise-generating retarders. Because the continued operation of those retarders is, according to the complaint, clearly in Norfolk Southern's control, the plaintiffs' claim is one for continuing nuisance, and damages for property-value diminution are not available.

**Conclusion**

It is, therefore,

ORDERED THAT:

1. Defendant's motion to dismiss be, and the same hereby is, granted in part and denied in part as provided herein; and

2. The clerk of court shall forthwith set this case for a telephonic status/scheduling conference.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge