# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# WESTERN DIVISION

Michael Nottke, et al.,                                 Case No. 3:17CV544

         Plaintiffs,

    v.                                                      **ORDER**

Norfolk Southern Railway Company,

         Defendant.

After defendant Norfolk Southern Railway Company (NS) expanded substantially its marshalling yard (now known as Moorman Yard) at Bellevue, Ohio, residents began complaining about excessive noise from the yard's car retarders.[1] This lawsuit seeks to remedy that problem.

The initial complaint of record to NS about this situation is a May, 2016, phone call from Richard Leonard, a Bellevue resident living 2,500 yards from Moorman Yard, to the office of William Galanko. Mr. Galanko was NS Vice President in charge of the NS Law Department. Though unanswered, Mr. Leonard's call led to an email from Linda F. Knight, Secretary in the Department, to one Robert Wells:

> Bob
>
> Do you handle this type of situation? If not can you forward it to the appropriate individual who might handle this type of situation.

---

[1] I take judicial notice that car retarders squeeze the flanges of railcar wheels, thereby controlling the cars' speed as they descend a marshalling yard's "hump" and roll toward their various assigned tracks to make up trains for later departure.

> Mr. Richard Leonard contacted Bill Galanko's (VP of Law Department office) today. The call rolled over to Donna Talani's telephone (VP's Assistant).
>
> Mr. Leonard requires someone to contact him in reference to the Hump yard in Bellevue, OH. Since NS did the rail expansion of the yard the noise is intolerable. Mr. Leonard lives 2000 feet from the yard. He and his neighbors would like to speak to someone at NS about this situation before they go out and get an attorney [to] handle their concerns.
>
> I appreciate you or someone who handles these situations to contact Mr. Leonard. His telephone number is [XXX-XXX-XXXX].

(Doc. 34, Exh. AA (sealed)).[2]

Thereafter, at some unspecified point and prompted by some unspecified purpose, NS retained Environmental Health and Safety Solutions, LLC (EHSS) to conduct noise level tests in the yard and its environs. The tests at issue occurred on August 26 and 27, 2015 and September 24, 2015.[3] EHSS addressed its test result reports of September 14, 2015, and October 28, 2015, respectively, to Mark Dudle, NS Director of Industrial Hygiene. There is no cc to anyone in the Law Department.

Before the first EHSS test in late August, the Lyme Township Board of Trustees sent NS a resolution they had adopted on August 4, 2015, "supporting Lyme Township resident's [*sic*] concerns about the excessive sealing noise" from the Yard. (Doc. 34, Exh. A).[4]

---

[2] NS has not affirmed, nor even asserted, that Mr. Wells was an attorney or otherwise affiliated with its Law Department. It seems to me to be a fair inference that he was neither: after all, if he had some connection with that Department, it would hardly be necessary for Ms. Knight to tell him that Mr. Galanko was Head of the Department or that Ms. Talini was Mr. Galanko's Assistant.

[3] NS submitted these results, along with a cover letter, under seal in conjunction with its filing of its motion for a protective order.

[4] The Trustees addressed their undated cover letter, without departmental affiliation, to Mr. Tim Bentley, III. They also cc'd fourteen public officials, the NS Board of Directors (by name), and President Squires, Vice-President Butler, and Executive Vice-President Earhart. Vice-President,

On September 14, 2015, before EHSS's second testing, Mr. Leonard sent a letter addressed to James A. Hixon, NS Executive Vice President, asking his "assistance to getting the owners and operators of the Moorman Yard to implement noise reduction improvements as are necessary and sufficient to reduce the transmission of noise. . . ." (*Id.*, Exh. B). Attached to the Leonard letter was a Petition (signed by eighty residents) and a copy of the August 4, 2015 Township Trustees Resolution.[5]

Neither the words, "attorney(s)," "lawyer(s)," "legal counsel," "lawsuit," "litigation," nor any of their synonyms appeared in either the Trustees Resolution or its cover letter to Mr. Bently or in Mr. Leonard's September 14, 2015 letter and its attachments to Mr. Hixon.

Pending is NS motion for a protective order, filed in response to the plaintiffs' discovery requests for production of the EHSS August and September tests and reports. (Doc. 34). In support of its motion, NS asserts the attorney work product doctrine. Claiming that the EHSS tests were in response to the Leonard call, NS states that its Law Department, through a person or persons not named and at a time not specified, "immediately began to investigate this issue." (Doc. 34-1, at 6).

Except for the materials I have thus far recited, NS offers no other factual basis in support of the putative nexus between the Leonard call and the test results.

That's it: NS presents no affidavits, correspondence, whether emails, e-mail chains, or other communications, statements, or memoranda indicating, *inter alia*, when Ms. Knight's email to Mr. Wells came to the attention of a member of the Law Department or what such

---

Legal Department Head Mr. Galanko was not cc'd. It was stamped received by the Law Department on August 31, 2015, a week after EHSS conducted its first test.

[5] Mr. Leonard cc'd his letter to the same recipients to whom the Trustees had sent their Resolution. Like the Trustees, he did not cc Mr. Galanko.

person or persons did or did not do upon its receipt, and what happened thereafter. Similarly, there is no correspondence, by email, letter, memo, or otherwise, indicating who made the decision to retain EHSS, why that retention occurred, or why, without cc to the Law Department, the test reports were addressed to the NS Director of Industrial Hygiene.

After May 19, 2015, when notice of Mr. Leonard's call went out to Mr. Wells, there is nothing in the record to connect the EHSS tests to anyone's apprehension that litigation might be in the offing.

## Discussion

Rule 26(b)(3)(A) of the Federal Rules of Civil Procedure precludes, on the basis of the attorney work product doctrine, unwilling disclosure of materials that an opposing party has prepared "in anticipation of litigation or for trial." This Rule and the work product doctrine it implements "shelter[] the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case. *U.S. v. Nobles,* 422 U.S. 225, 238-39 (1975). The protection of the doctrine extends to materials that others have prepared "as long as such documents were prepared in anticipation of litigation." *Roa* v. *Tetrick,* 2014 WL 695961, *2 (S.D. Ohio).

Preparation in anticipation of litigation is the predicate for the doctrine. To meet this requirement, the movant must prove that the "document was prepared because of a party's subjective anticipation of litigation" and that "its subjective anticipation was objectively reasonable." *In re Professionals Direct Ins. Co.,* 578 F.3d 432, 439 (6th Cir. 2009) (internal quotation marks omitted); *Biergas v. Quickway Carriers, Inc.,* 573 F.3d 365, 381 (6th Cir. 2009).

4

In evaluating whether a party has met this burden, "the courts generally look to a showing based on affidavits or equivalent statements that address each document at issue." *U.S. v. Roxworthy*, 457 F.3d 590, 597 (6th Cir. 2006).

Conclusory assertions regarding a putative anticipation of litigation are not enough to invoke the work product doctrine. *E.g.*, *Toledo Edison v. G.A. Technologies, Inc.*, 847 F.2d 335, 339 (6th Cir. 1988) ("application of the privilege will be rejected where the only basis for the claim is an affidavit containing conclusory statement[s]"); *Young v. Chapman*, 2016 WL 1717226, *7 (W.D. Ky.) (attorney's "affidavit is conclusory; it fails to provide the sort of 'specific and detailed' information that would demonstrate that the documents were prepared in anticipation of litigation."); *U.S. v. Eaton Corp.*, 2012 WL 3486910, *4 (N.D. Ohio) (party provided no support for work product claim "other than conclusory allegation that the work product doctrine applied").

In its reply brief, NS goes to great lengths (but, in the end, gets nowhere) trying to point to factual differences between *Roxworthy* and related cases. (Doc. 40, at 7-8 of 15). NS simply ignores the bedrock proposition that conclusory allegations about anticipated litigation do not adequately undergird a work product claim.

Well-padded with citations, the NS briefs, stripped of those layers, are bare of factual substance. Read *in toto,* what Mr. Leonard wanted was simply to hear from, and to voice his concerns to, someone at NS; that's what mattered, not getting an attorney, much less filing a lawsuit. But NS responded with silence, as it did to the Trustees Resolution and the neighbors' petition. Read together, all Mr. Leonard and they wanted was some response to their plight.

Deaf ear then, silence now: even if affidavits, depositions, and the like are not required – though generally expected and offered – and even if other kinds of evidence might, as it probably

5

could, make out a valid and adequate work product claim, NS presents no evidence other than the Leonard May-day call three and four months before the EHSS tests. Here, as in *University Hospital Health Systems v. Pohl, Inc. of America*, 2018 WL 1474368, *3 (N.D. Ohio), "nowhere . . . is there any mention of litigation or even the potential of litigation" in any communications. Indeed, here NS offers none of its own communications at all. The case law makes compellingly clear that something more is needed to give rise to an actual and a *reasonable* anticipation that litigation might arise. There is no evidence on either score in this record.

Instead, NS, by its persistent lack of response, communicated an unstated message to its neighbors that it did not care, that it could and would continue to do as it wanted, and that it had nothing to fear, no matter how many voices sought to be heard.

**Conclusion**

I find that NS has failed to meet its burden of showing even reason to believe, much less probable cause, that it engaged EHSS to do noise testing because it actually apprehended that Mr. Leonard or anyone else was a potential litigant. I also find that, even if someone in NS somehow – whoever that might have been – really had such apprehension, it was entirely unreasonable and unrealistic.

It is, accordingly,

ORDERED THAT:

1. The defendant's motion for a protective order (Doc. 34) be, and the same hereby is denied; and

2. The defendant shall forthwith provide the plaintiffs with the raw data, test results, and reports, inclusive, dated September 14, 2015, and October 28, 2015, and submitted by letter in conjunction with that motion.[6]

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge

---

[6] NS suggests that all that plaintiffs seek is "raw data." Not so: plaintiffs' interrogatories also seek the test results – *i.e,* the EHSS test reports. In any event, those narratives deserve no more work product protection than the data that underlies them.