# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# WESTERN DIVISION

Michael Nottke, et al.,                                            Case No. 3:17CV544

         Plaintiffs,

     v.                                                           **ORDER**

Norfolk Southern Railway Co.,

         Defendant.

On April 10, 2018, I denied the defendant Norfolk Southern's (NS) motion for a protective order and ordered it to produce certain noise level studies dated September 14 and October 28, 2015, and related narrative reports dated September 29 and October 31, 2015, respectively. In doing so, I rejected defendant's claim that the work product doctrine protects the studies and reports from disclosure to plaintiffs. *Nottke v. Norfolk S. Ry. Co.*, 2018 WL 1737617 (N.D. Ohio).

Pending is defendant's motion to reconsider, in which the defendant asks me, on reconsideration, to find that the doctrine applies and thereon vacate my original order. (Doc. 43).

Defendant asserts that I clearly erred in entering the order because I: 1) misconstrued the facts of record; 2) drew an inference as to the actions of plaintiffs and others leading to litigation, without doing likewise as to the defendant; 3) exceeded the scope of the inquiry, as I had projected it in an order filed on November 1, 2017 (namely, that I limited the scope of production to "baseline data," not the associated narrative reports);[1] and 4) failed to find that plaintiffs have a

---

[1] NS, however, attached the October 28 data and October 31 report as exhibits to its motion for a protective order. Its motion for reconsideration states it did so inadvertently. Nonetheless,

special need for the studies or that they lack alternative means of obtaining equivalent information on their own.

As NS requests, I have reconsidered the April 20 order and the briefs, exhibits, and arguments. On my further consideration of all the briefs, exhibits, facts of record, arguments, and applicable law, I remain convinced that the work product doctrine does not protect the materials at issue. Accordingly, for the reasons that follow, I deny the motion and affirm my original order denying the motion for a protective order and its directive to produce those documents.

**Background**

In May, 2015, Richard Leonard, a Bellevue resident, called the office of William Galanko. Mr. Galanko was NS Vice President in charge of the NS Law Department. Though unanswered, Mr. Leonard's call and his voicemail message led to an email from Linda F. Knight, Secretary in the Department, to one Robert Wells:

> Bob
>
> Do you handle this type of situation? If not can you forward it to the appropriate individual who might handle this type of situation. Mr. Richard Leonard contacted Bill Galanko's (VP of Law Department office) today. The call rolled over to Donna Talani's telephone (VP's Assistant).
>
> Mr. Leonard requires someone to contact him in reference to the Hump yard in Bellevue, OH. Since NS did the rail expansion of the yard the noise is intolerable. Mr. Leonard lives 2000 feet from the yard. He and his neighbors would like to speak to someone at NS about this situation before they go out and get an attorney [to] handle their concerns.

---

because I find that NS neither realistically anticipated litigation on the basis that it claims (*i.e.*, the Leonard phone call in May, 2015, *see infra*), nor could have done so reasonably, the work product doctrine gives no protection to that data any more than it does the September data and report.

I appreciate you or someone who handles these situations to contact Mr. Leonard. His telephone number is [XXX-XXX-XXXX].[2]

(Doc. 34, Exh. AA).

Though the privilege log indicated that Mr. Wells was NS's General Manager Casualty Claims (*id.*), the record does not reflect an affiliation with the Law Department.[3]

Nothing in the record shows that Mr. Wells or anyone else inside or outside the Law Department responded to Mr. Leonard's call.

Roughly three months after that call, and after NS had, on some undisclosed date, commissioned Environmental Health and Safety Solutions (EHSS) to conduct the noise emission

---

[2] I assume, as NS and I have all along, that Ms. Knight's reference to "going out and get[ting] an attorney [to] handle things" is a verbatim transcription of Mr. Leonard's words.

[3] NS's motion represents that Mr. Wells is, in fact, in the Law Department. (Doc. 43, pg. ID #560). It asserts that I erred in "not noting Mr. Wells' position with Defendant as was denoted in Defendant's Privilege Log." (*Id.*). I did notice his Casualty Claims Manager title, and also that the record did not indicate Mr. Wells' affiliation with the Department. (Doc. 42, pg. ID#544). That's what mattered.

NS also faults me for drawing the inference that Mr. Wells was not in the Department from the fact that the email to him noted parenthetically that Mr. Galanko was VP of the Department. (*Id.*). It seemed odd to me – and still does – that, if someone is in a department, an intra-departmental email would tell a subordinate who its Vice-President is.

Most importantly, the *record* does not state Mr. Wells was either an attorney or that he works in the Law Department. There is nothing in the *record* to show that the request to "handle this" went to a lawyer, much less a member of the Law Department. That omission weakens substantially, if not fatally, NS's claim that its *Law Department* immediately went into a pre-litigation mode and posture.

In any event, for me to have concluded that Mr. Wells was in the Law Department would have been based on nothing other than unsupported and unsustainable speculation.

studies at issue here,[4] it received its second of three communications about citizen concerns with retarder noise emanating from Moorman Yard. On August 31, 2015, a week after the first data collection, the Law Department received a copy of a Resolution that the Lyme Township Board had adopted on August 4, 2015.[5] Accompanying the Resolution was an undated cover letter signed by plaintiff Nottke, Chair of the Township Board. The Resolution stated, *inter alia*:

> Therefore, the Board of Trustees does hereby request that the Owners and Operators of the Norfolk Southern Bellevue Rail Yard, aka the Bellevue Terminal, nka the Moorman Yard, implement noise reduction improvements as are necessary and sufficient to reduce the transmission of noise from their Rail Yard property by any means appropriate, including noise barrier walls similar to highway traffic noise barrier walls, at their sole cost and

---

[4] NS contends that my order erroneously stated that NS commissioned the studies "at some unspecified point and prompted by some unspecified purpose." (Doc. 43, pg ID #562 ). So far as the *record* shows, that was and remains so. To be sure, in its original motion NS represented that it had the testing "performed in anticipation of litigation, namely this case . . . and that testing [was] similarly performed in anticipation of unrelated pending and anticipated FELA litigation." (Doc. 34, at pg ID#349).

Somewhat – at least – confusingly, in the pending motion, NS states that it had retained EHSS to undertake "such testing to evaluate compliance with FRA regulations following Mr. Leonard's and Mr. Nottke's complaints." (Doc. 43, at pg ID#562). As noted *infra,* the first "complaint" NS received from plaintiff Nottke came a week after the EHSS noise testing had begun. So that "complaint" had nothing to do with the decision to undertake the testing.

Moreover, in light of the representation in the instant motion about an FRA-related purpose, rather than anticipation of litigation in this case or a FELA-related purpose, it is not possible to find which of these purposes motivated NS to have EHSS do the studies here. Nor has NS connected any FELA-related studies to actual pending litigation or reason to apprehend such litigation or any FRA administrative proceedings.

Most importantly, when I noted that the purpose for the instant studies was unspecified, the *record* was, as it still is, barren of evidence that indicates when and why NS caused the studies to occur.

[5] In its motion, NS states the letter was dated August 4, 2015. It was not: it was undated; the Board had adopted the Resolution on that date. What matters is that the first notice NS had of the Resolution was its arrival at the Law Department on August 31, 2015. Consequently, the letter and Resolution could have played no role whatsoever in the decision to undertake noise testing.

4

expense; and Further, that Norfolk Southern install such improvements immediately and complete the improvements in a timely manner to alleviate excessive and injurious noise from their operations for the health and benefit of the Township.

(Doc. 34-3, Exh. A, pg ID#377).[6]

EHSS submitted its narrative report on the August test results in September, 2015. It conducted further studies on September 29, 2015. Though not indicated on the cover of those reports, the railroad's privilege log indicates copies were sent to one of its attorneys.

On September 14, 2015, between the first and second EHSS testing sessions, NS received its third and last communication of record from a resident about noise levels coming from the Yard. This was a letter from Mr. Leonard, the original caller, sent to James A. Hixon, NS Executive Vice President, asking his "assistance to getting the owners and operators of the Moorman Yard to implement noise reduction improvements as are necessary and sufficient to reduce the transmission of noise[.]" (*Id*., Exh. B). Attached to the Leonard letter was a petition (signed by eighty Bellevue residents) and a copy of the August 4, 2015 Township Trustees Resolution.

NS contends that immediately on learning about Mr. Leonard's May, 2015, call, it anticipated that litigation was likely. (Doc. 34–1 at 6, 15, 16). It also suggests, at least by implication, that the subsequent cover letter and attached petition and letter from Mr. Leonard enhanced its apprehension about forthcoming litigation.

NS points to nothing else to it from or on behalf of Bellevue residents that triggered its alleged anticipation of litigation, or that any such apprehension was reasonable.[7] In its motion, NS

---

[6] Nothing in the Board's Resolution or Mr. Nottke's cover letter says anything about "going out and get[ting] an attorney."

5

asks me, on the basis of the attorney work product doctrine, to revoke my order that it produce the test data and results.

After reviewing the original motion and the motion for reconsideration, the briefs, and the exhibits, I conclude that: 1) NS has failed to prove it is more likely than not that its acquisition of the EHHS noise level tests was caused by an anticipation of litigation; and 2) in any event, even if the Leonard call, as NS claims, triggered such apprehension, it was not reasonable. In light of those findings, the work product doctrine does not protect the noise level test data and results from disclosure.

Accordingly, I deny the motion for reconsideration, confirm my denial of NS's motion for a protective order, and order it to produce the data and results within two weeks of the entry of this order.

---

[7] In its motion for reconsideration, NS represents that, due to its understanding of the narrowness of the issue before the court, as reflected in the order of November 1, 2017, setting the briefing timetable (Doc. 23), "it did not brief the lengthy background of exchanges between and among Plaintiffs, the Township, local and national officials, and Norfolk Southern regarding resolution of the noise complaints following Mr. Leonard's May, 2015 message. Despite this, and in light of the absence of such subject matter in the parties' briefing on this issue, it is unclear on what factual basis the Court states that in its motion, it acted with a '[d]eaf ear then; silence now', and that there was a 'persistent lack of response' by Defendant to Plaintiffs' concerns. (Order, at 5-6)." (Doc. 43, pg ID#563, n.2).

The record before me created that impression. The *record* remains devoid of evidence as to what NS did in response, except for its claim that Mr. Leonard's May, 2015 triggered the testing at issue. Moreover, nothing in the representation in NS's instant motion refers to any involvement in any "lengthy . . . exchanges between Plaintiffs, the Township, local and national officials, and Norfolk Southern regarding resolution of the noise complaints."

I note that nothing in that representation refers to initiation of or involvement by an attorney on behalf of the plaintiffs.

## Discussion

The work product doctrine bars disclosure of materials prepared "in anticipation of litigation." Fed. R. Civ. P. 26(b)(2)(C)(3).

In *U.S. v. Roxworthy*, 457 F.3d 590, 593 (6th Cir. 2006), the court stated that the doctrine covers material prepared "because of the prospect of litigation." Courts implementing this test must ask "(1) whether a document was created because of a party's subjective anticipation of litigation, as contrasted with an ordinary business purpose, and (2) whether that subjective anticipation of litigation was objectively reasonable." *Id.* at 594.

The court also noted that courts applying the "because of" test have required the party claiming the privilege to establish that it "had a subjective belief that litigation was a real possibility." *Id.* at 593. Implementing this requirement in *Jones v. St. Jude's Med. S.C., Inc.*, 2011 WL 829086 (S.D. Ohio), the court stated that the prospect of future litigation cannot be "remote."

In *Roxworthy*, the court gave clear guidance as to how a party can best makes its work product claim:

> We have stated that a party may satisfy its burden of showing anticipation of litigation "in any of the traditional ways in which proof is produced in pretrial proceedings such as affidavits made on personal knowledge, depositions, or answers to interrogatories," and that the showing "can be opposed or controverted in the same manner." *Toledo Edison,* 847 F.2d at 339. *See also Bowne of New York City, Inc. v. AmBase Corp.,* 150 F.R.D. 465, 473 (S.D.N.Y.1993) ("In requiring a party to prove the factual basis for its claims of privilege, the *courts generally look to a showing based on affidavits or equivalent statements that address each document at issue*.").

457 F.3d at 597 (emphasis supplied).

Subsequently, the Circuit and lower courts in our Circuit have noted the lack of affidavits in the course of ruling against parties who have asserted the work product doctrine. *See Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 381-82 (6th Cir. 2009) (claimant failed to provide

7

"affidavits or similar proof"); *Burns & McDonnell Eng'g Co. v. NL Tech. Servs., Gmbh*, 2018 WL 3326835, *1 (W.D. Tenn.) (same).

Even where a claimant submits affidavits, simple conclusory assertions are not enough. The Circuit made that clear in *Toledo Edison v. G.A. Technologies, Inc.*, 847 F.2d 335, 339 (6th Cir. 1988), emphasizing that courts will reject work product claims where "the only basis for the claim is an affidavit containing conclusory statement[s]." This is so because, where an attorney's "affidavit is conclusory, it *fails to provide the sort of specific and detailed information that would demonstrate that the documents were prepared in anticipation of litigation*." *Young v. Chapman*, 2016 WL 1717226, *7 (W.D. Ky.) (emphasis supplied).

As already noted, NS submitted no affidavits with its motion for protective order. It has, as also noted, included a lot of possibly pertinent information in its motions. But "an attorney's statement in a brief is not evidence." *Associação Brasileira de Medicina de Grupo v. Stryker Corp.*, 891 F.3d 615, 621 (6th Cir. 2018).

Since *Roxworthy*, lower courts consistently have required claimants to provide admissible evidence "that, in fact, the anticipation of litigation was *the motivating factor* behind the preparation of the documents." *Jones*, *supra*, 2011 WL 829086 at *5–6 (emphasis supplied); *see also Gruenbaum v. Werner Enters., Inc.,* 270 F.R.D. 298 (S.D. Ohio 2010); *Goldfaden v. Wyeth Labs., Inc.,* 2009 WL 2602437 (E.D. Mich.).

As the court stated in *Jones*, *supra*, 2011 WL 829086 at *6, "the threat of litigation had to be more than a "remote prospect of future litigation and not simply a suspicion that, because of the corporations' conduct, litigation of some sort in the future might occur." Indeed, even where an attorney had communicated with the claimant prior to the claimant's preparation of the alleged

8

work product, courts have rejected the claim. *Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124, 139 (3d Cir. 2000); *Jones, supra,* 2011 WL 829086 at *6; *see also Robinson v. Winslow Twp.*, 2012 WL 113643, *3 (D.N.J.) (deceased employee-victim's family had retained an attorney two weeks before third party interviewed witnesses).

Moreover, courts, as in *Jones,* have found the materials unprotected even in circumstances in which, at some point, litigation might occur. *See Love v. Sears, Roebuck*, 2014 WL 1092270, *1 (W.D. Ky.) (investigation report after a customer accident was a "routine matter of business"); *Robinson, supra,* 2012 WL 113643, at *3 (third-party witness interviews conducted after a beating death by a police officer were not protected).

After the reference reported in Ms. Knight's email to Mr. Wells to "going out and get an attorney to handle things," there was no mention in the two subsequent communications, which came after a gap of roughly three and four months later, to an attorney. The only reference to an attorney was in the first call. And, as Ms. Knight reported to Mr. Wells, the message was in essence a request for a response to the problem *before* Mr. Leonard was "going out to get an attorney to handle things." NS has cited no case in which such an opaque statement, much less one transmitted second-hand, from a private citizen to a corporation, has led to successful invocation of the work product doctrine.

The issue here is one of proximate cause: does the evidence show that Mr. Leonard's call created an anticipation (not a mere apprehension) of forthcoming litigation that it motivated and caused it to retain EHSS?[8]

---

[8] Though NS claims the call immediately caused it to anticipate litigation (Doc. 34–1 at 16), its studies only began three and four months later.

9

What I have before me lacks sufficient evidentiary weight to find that it is more likely so than not so that the call was the motivation and cause for the studies. The greater weight of the evidence – including NS's shifting statements as to the testing's purposes – shows that it had business reasons for obtaining the studies.

I find that this one statement from Mr. Leonard, with no follow-up in the record for about three months, at which time NS had already commissioned EHHS to conduct its study, standing alone, simply did not, in fact, engender a *bona fide* anticipation that Mr. Leonard, or anybody else, was going to seek legal redress. The railroad's contention that its decision to have the testing done because of the call, or that that decision was motivated by the call, is, absent any other supporting *evidence*, implausible.

It is, rather, more likely that NS had other business purposes in mind, whether FELA- or FRA-related, in mind.[9]

Finally, any apprehension of future litigation that Mr. Leonard's call may, in (dubious) fact, have instilled was not reasonable. That a reasonable corporation would immediately conclude that a lawsuit was in its near future is not likely. This was not a situation, as with a slip-and-fall, car accident, or similar occurrences, that called for immediate investigation and the opening of a litigation file. Even if, contrary to my firm conviction, that is what NS did, it was not, under all the circumstances, reasonable for it to do so.

---

[9] If so, the studies might be protected, but only if NS established that its anticipation of FELA litigation or FRA administrative proceedings were actual, other than remote. There is nothing in the record here one way or the other. In any event, NS has not argued that point.

## Conclusion

Apprehending the possibility of litigation is not the same as anticipating its likelihood. At most, if at all, NS may have apprehended that someday (which in this case came two years after Mr. Leonard's call) suit might be filed, such apprehension was not enough to justify its claim of work product protection. Any putative anticipation would have been, in any event, unreasonable.

The railroad's claim that the work product doctrine protects the August and September, 2015, testing data and reports from disclosure is not well-taken. There is thus no reason to address whether the plaintiffs have a special need for those documents.

In light of the foregoing, it is hereby

ORDERED THAT:

1. The motion of Norfolk Southern Railroad Co. for reconsideration (Doc. 43) be, and the same hereby is, overruled;
2. The prior order (Doc. 42) denying Norfolk Southern's motion for a protective order (Doc. 34) be, and the same hereby is, confirmed; and
3. The defendant shall produce the materials at issue within fourteen days of the date of this order.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge